**HERMAN JONES LLP**
SERINA M. VASH
153 Central Avenue #131
Westfield, NJ 07090
svash@hermanjones.com
Telephone: (404) 504-6516
Facsimile: (404) 504-6501

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEPHEN NELSON, derivatively on behalf of Nominal Defendant PayPal Holdings, Inc., | **No. 03:23-cv-01913** |
| PLAINTIFF, | |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| DANIEL H. SCHULMAN, JOHN D. RAINEY, RODNEY C. ADKINS, JONATHAN CHRISTODORO, JOHN J. DONAHOE, BELINDA J. JOHNSON, ENRIQUE LORES, GAIL J. McGOVERN, DEBORAH M. MESSEMER, DAVID M. MOFFETT, ANN M. SARNOFF, FRANK D. YEARY, | **JURY TRIAL DEMANDED** |
| DEFENDANTS, | |
| and | |
| PAYPAL HOLDINGS, INC., | |
| NOMINAL DEFENDANT. | |

1

Plaintiff Stephen Nelson, by and through his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, Gross Mismanagement, Aiding and Abetting, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Daniel H. Schulman ("Schulman"), John D. Rainey ("Rainey"), Rodney C. Adkins ("Adkins"), Jonathan Christodoro ("Christodoro"), John J. Donahoe ("Donahoe"), Belinda J. Johnson ("Johnson"), Enrique Lores ("Lores"), Gail J. McGovern ("McGovern"), Deborah M. Messemer ("Messemer"), David M. Moffett ("Moffett"), Ann M. Sarnoff ("Sarnoff") and Frank D. Yeary ("Yeary") (Schulman, Rainey, Adkins, Christodoro, Donahoe, Johnson, Lores, McGovern, Messemer, Moffett, Sarnoff and Yeary are collectively referred to herein as the "Individual Defendants") and nominal defendant PayPal Holdings, Inc. ("PayPal" or the "Company"). Plaintiff's allegations are based upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including the review of publicly available information, including filings by PayPal with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the securities litigation class action styled *In re PayPal Holdings Inc. Securities Litigation*, Lead Case No. 3:22-cv-05864-GC-

LHG (the "Consolidated Securities Class Action"), and other matters of public record, except as to the allegations specifically pertaining to the Plaintiff, which are based on Plaintiff's personal knowledge.

## I.    INTRODUCTION

1.    This is a stockholder derivative action brought on behalf of and for the benefit of PayPal, against certain of its officers and directors, seeking to remedy their breaches of fiduciary duty, waste of corporate assets, unjust enrichment, gross mismanagement, aiding and abetting and violations of the Exchange Act. Defendants' actions, as set forth more fully herein, have caused substantial financial and reputational harm to PayPal.

2.    PayPal is a leading digital payments platform used by merchants and consumers worldwide.  Nearly 90% of its revenue is generated through fees on transactions over its payment systems.  The greater the number of active and engaged users of PayPal accounts, the greater fees PayPal is likely to generate.  From February 3, 2021 through February 1, 2022 (the "Class Period"), PayPal held out the number of new PayPal users, or Net New Active Accounts ("NNAs"), as a critical driver of its financial performance.  During the Class Period, PayPal stated that "measuring NNAs reinforces the critical importance of growing our customer base

to build for the future.  The number of NNAs is also a key operational metric that the Company uses internally to measure ongoing performance."[1]

3.      During the Class Period, PayPal touted significant growth in NNAs and assured the investing public that these NNAs were actively engaged users.  PayPal maintained that it would add 50 million NNAs in 2021 and 750 million by the end of 2025.

4.      In an attempt to further the growth of NNAs, and unbeknownst to the investing public, PayPal relied heavily on cash promotions to fuel its growth during the Class Period.  Through these promotions, PayPal paid cash incentives, including cash bonuses of $5 and $10, to customers who opened new accounts.

5.      PayPal knew, but failed to disclose to the public, that many of the new users who received cash incentives in connection with opening new PayPal accounts were not legitimate users.  PayPal failed to disclose that, because of the cash incentives, bot farms created millions of fraudulent PayPal accounts.  Thus, the bot farms systematically manipulated PayPal's cash marketing incentives and diverted millions of dollars to fraudulent actors, while generating no actual revenue for PayPal.  Despite this, PayPal did not disclose to the public that millions of the user numbers included in its NNAs figures were fake, or that fraudulent actors who

---

[1] PayPal Holdings, Inc., 2021 Proxy Statement, at 48.

contributed nothing to PayPal's bottom line had received a multi-million dollar windfall.

6.      Further, contrary to PayPal's contentions during the Class Period, many new account holders opened accounts and remained on the platform simply to take advantage of the incentives.  Far from being high quality active users, these users in fact had "lower engagement and a higher propensity to churn."

7.      When PayPal issued its third quarter 2021 financial results, Defendants knew that PayPal was counting as NNAs the virtually dormant accounts opened by users simply seeking the cash incentives, as well as millions of illegitimate bot created accounts created by fraudulent actors seeking the incentive payments.

8.      On February 1, 2022, belatedly, and long after knowing that there were serious problems with NNA growth, PayPal finally revealed the extent of the failure of its incentive program to drive growth.  PayPal disclosed that it had identified rampant bot activity resulting in **4.5 million** accounts fraudulently created during the increased use of cash incentives in 2021.  Further, PayPal admitted that it had pursued customer acquisition strategies designed to boost NNA figures at the expense of revenue and without regard for whether the use of cash incentives resulted in illegitimate customers or those who would result in low engagement and/or turnover.  In addition, PayPal finally disclosed that while its incentive programs were "very successful in generating account creation, these customers

have lower engagement and a higher propensity to churn and have not met our required level of return." The Company stated that, as a consequence, it would shift its focus from growing NNAs, retaining inactive customers and avoiding churn to focusing on driving active customer engagement. PayPal altogether abandoned its previously touted goal of having 750 million active users by 2025.

9.     Upon this news, PayPal's stock price fell from $132.57 to $89.34, a decrease of $43.23 or nearly 25%. The plunge in share price was PayPal's fastest drop ever, erasing roughly $50 billion in market value.

10.     Defendants failed to disclose to their stockholders and the market that: (1) PayPal was aggressively using financial incentives to drive up NNA figures; (2) PayPal's incentive program was being exploited by fraudulent actors and resulted in the creation of millions of sham accounts; (3) a significant number of new users simply created accounts for the money they received and their accounts should have been deemed inactive; and (4) consequently, the Company's financial results were artificially inflated. As a direct result of the foregoing and Defendants' unlawful course of conduct described herein, the Company misled its stockholders and the investing public about its business, operations, and prospects. Its positive statements about the same were materially false and/or misleading and/or lacked a reasonable basis, and when the true facts were finally revealed to the public, the stock price of PayPal was significantly impacted.

11.     Moreover, PayPal and Defendants Shulman and Rainey are now the subject of a consolidated securities class action litigation in this same District, styled: *In re PayPal Holdings Inc. Securities Litigation*, Lead Case No. 3:22-cv-05864-GC-LHG.  The Consolidated Securities Class Action sets forth claims on behalf of PayPal stockholders, asserting that the defendants in that action: (i) had knowledge of, or reckless disregard for the risks the financial promotions and the resulting proliferation of minimally engaged and illegitimate accounts; (ii)  touted strong NNA growth and engagement while fraudulently concealing the problems underlying PayPal's use of promotions; and (iii) as a result of the aforementioned, (a) the Company's growth was decelerating, (b) the Company's financial results were adversely affected, and (c) the defendants' positive statements about the Company's business, operations and prospects were materially false and/or misleading and/or lacked a reasonable basis.  Through the Consolidated Securities Class Action, the plaintiffs therein assert that, as a result of the aforementioned wrongful actions and the precipitous declines in the price of the Company's securities, the plaintiffs and other class members suffered significant losses and damages.

12.     Despite their knowledge of the facts and information that had an adverse impact on the Company's business, operations and prospects, and that the Company's SEC filings did not reflect the aforementioned adverse facts and

information and knowing that the PayPal stock was trading at an artificially inflated price as a result, several of the Defendants here, utilizing their inside knowledge of facts not publicly known, sold significant amounts of their personally held shares of PayPal Inc. stock.

13.    As a direct and proximate result of Defendants' misconduct, PayPal has incurred significant financial losses, including the costs of defending and paying damages in the Consolidated Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

14.    Defendants here now face liability to the Company for their multiple breaches of their fiduciary duties to the Company by, *inter  alia*, (i) affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's business, operations and prospects; (ii) failing to maintain adequate controls regarding the Company's reporting; (iii) trading in the stock of the Company based on their inside knowledge of the events described herein; and (iv) such other and further actions described herein.

15.    Plaintiff made a demand that the Company pursue claims against the PayPal Board of Directors (the "Board") given their knowledge and involvement in the wrongdoing, the blatant failure to act, their lack of independence, and the substantial likelihood of liability its members face.  Plaintiff made his demand on the Board on November 9, 2022 and the Board failed to take action thereafter.

8

Plaintiff brings this action to remedy the harm to PayPal caused by Defendants' faithless actions.

## II.    JURISDICTION AND VENUE

16.    This Court has jurisdiction under 28 U.S.C. § 1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.    This Court has jurisdiction over each named Defendant.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    Additionally, this Court has specific jurisdiction over each named Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.  Further, jurisdiction is proper under 28 U.S.C. § 1331.

20.    Venue is proper in this Court under 28 U.S.C. § 1391 because: (i) misstatements were publicly disseminated to investors within this District, affecting the market price for shares of PayPal stock, and causing damages to investors within this District; and (ii) Defendants have received substantial

compensation in this District by transacting business here and engaging in numerous activities that had an effect in this District.

21.     Further, venue is proper as this derivative stockholder action is related to the consolidated shareholder action styled *In re PayPal Holdings Inc. Securities Litigation*, Lead Case No. 3:22-cv-05864-GC-LHG, which also is pending in this district.

## III.   THE PARTIES

22.     Plaintiff Stephen Nelson was stockholder of PayPal at the time of wrongdoing complained of, has continuously been a stockholder since that time, and is a current PayPal stockholder.

23.     Plaintiff is a citizen of the State of Georgia.

### A.   Nominal Defendant

24.     Nominal defendant PayPal is a publicly traded Delaware corporation with its principal executive offices located at 2211 North First Street, San Jose, California 95131.

25.     The Company's common stock trades on the NASDAQ exchange under the ticker symbol "PYPL."  PayPal has approximately 1.13 billion shares of common stock outstanding.

**B.    Individual Defendants**

26.    Defendant Daniel H. Schulman is PayPal's CEO.  He has been the President and Chief Executive Officer of PayPal since July 2015 and served as the President and CEO-Designee of PayPal from September 2014 until July 2015.

27.    Upon information and belief, Schulman is a citizen of the State of Massachusetts.

28.    PayPal's Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Securities and Exchange Act"), filed with the Securities and Exchange Commission (the "SEC") on April 13, 2021 (the 2021 Proxy Statement") states that Schulman beneficially owned 364,755 shares of the Company's stock as of the time of the aforementioned filing.  Based upon the closing price of PayPal's common stock on March 30, 2021, Schulman beneficially owned $86,279,147.70 of PayPal stock as of that date.

29.    For the fiscal year ended December 31, 2020, Defendant Schulman received $23,362,072.00 in compensation from the company.  Schulman's fiscal year 2020 compensation includes the following:  $1,038,462 in salary, $20,957,193 in stock awards, $1,000,000 in non-equity incentive plan compensation and $366,417 in other additional compensation.

30.    From 2018 through 2020, the Company paid Schulman total compensation of $86,922,133.

11

31.    Between February 3, 2021 and February 1, 2022, while the price of PayPal stock was artificially inflated and Schulman was in possession of material, adverse, nonpublic information, Schulman sold 347,235 shares of personally held PayPal stock, with a value of $91,187,135.96 at artificially inflated prices.

32.    Defendant John Rainey is PayPal's former Chief Financial Officer ("CFO") and served as CFO at all times relevant hereto.  According to PayPal's 2021 Proxy Statement, from September 2016 to January 2018 Defendant Rainey also was PayPal's Executive Vice President, CFO, and its Senior Vice President, CFO, from August 2015 to September 2016.

33.    Upon information and belief, Rainey is a citizen of the State of California.

34.    PayPal's 2021 Proxy Statement states that Rainey beneficially owned 107,845 shares of the Company's stock as of the time of the aforementioned filing. Based upon the closing price of PayPal's common stock on March 30, 2021, Defendant Rainey beneficially owned $25,509,656.30 of PayPal stock as of that date.

35.    For the fiscal year ended December 31, 2020, Defendant Rainey received $10,015,110 in compensation from the company.  Rainey's fiscal year 2020 compensation includes the following:   $778,846 in salary, $8,896,739 in stock

awards, $328,125 in non-equity incentive plan compensation and $11,400 in other additional compensation.

36.    From 2018 through 2020, the Company paid Rainey total compensation of $30,430,914.00.

37.    Between February 3, 2021 and February 1, 2022, while the price of PayPal stock was artificially inflated and Rainey was in possession of material, adverse, nonpublic information, Rainey sold 149,291 shares of personally held PayPal stock, with a value of $39,111,582.31, at artificially inflated prices.

38.    Defendant Rodney C. Adkins has served as a director of the Company since September 2017.  Adkins is a member of the Audit, Risk and Compliance ("ARC") Committee and the Corporate Governance and Nominating Committee (the "Governance Committee").

39.    Upon information and belief, Adkins is a citizen of the State of Connecticut.

40.    According to the 2021 Proxy Statement, Adkins beneficially owned 17,843 shares of PayPal's stock as of the time of the aforementioned filing.  Based upon the closing price of PayPal's common stock on March 30, 2021, Adkins beneficially owned $4,220,583.22 of the Company's stock as of that date.

41.    For fiscal year 2020, the Company paid Adkins total compensation of $385,096; $110,000 in fees earned and $275,096 in stock awards.

13

42.    Defendant Jonathan Christodoro has served as a director of the Company since July 2015.  He is a member of the Compensation Committee and the Governance Committee.

43.    Christodoro is a Partner at Patriot Global Management, LP.

44.    Upon information and belief, Christodoro is a citizen of the State of California.

45.    According to the Company's 2021 Proxy Statement, Christodoro beneficially owned 24,087 shares of the Company's stock as of the time of the aforementioned filing.  Based upon the closing price of the Company's common stock on March 30, 2021, Christodoro beneficially owned $5,697,538.98 of PayPal stock as of that date.

46.    For the fiscal 2020, PayPal paid Christodoro $382,685 in compensation; $107,589 in fees earned and $275,096 in stock awards.

47.    Defendant John J. Donahoe has served as a director of the Company since July 2015.

48.    Donahoe also is President and CEO of Nike and has been since January 2020.

49.    Upon information and belief, Donahoe is a citizen of the State of California.

50.     According to the 2021 Proxy Statement, Donahoe beneficially owned 56,630 shares of PayPal's stock as of the time of the aforementioned filing.  Based upon the closing price of PayPal's common stock on March 30, 2021, Defendant Donahoe beneficially owned $13,395,260.20 of PayPal stock. On that date.

51.     For the fiscal year ended December 31, 2020, Donahoe received $455,046 in compensation from the Company: $130,000 in fees earned, and $325,046 in stock awards.

52.     Defendant Belinda J. Johnson has served as a director of the Company since January 2017.   She is a member of the Audit, Risk, and Compliance Committee.

53.     Johnson is the former Chief Operating Officer of Airbnb, Inc.

54.     Upon information and belief, Johnson is a citizen of the State of California.

55.     According to PayPal's 2021 Proxy Statement, Johnson beneficially owned 17,199 shares of PayPal's stock as of the time of the aforementioned filing. Based upon the closing price of the Company's common stock on March 30, 2021, Johnson owned $4,068,251.46 of PayPal stock on that date.

56.     For the fiscal year ending December 31, 2020, Johnson received $375,096 in compensation from PayPal: $100,000 in fees earned and $275,096 in stock awards.

57.     Defendant Enrique Lores has served as a director of PayPal since June 2021.  Lores is a member of the ARC Committee.

58.     Lores is the President and CEO of HP Inc.

59.     Upon information and belief, Lores is a citizen of the State of California.

60.     According to PayPal's June 29, 2021 Form 4 filing with the SEC, on June 29, 2021, Lores beneficially owned 852 shares of the Company's stock.  Based upon the closing price of PayPal's common stock on June 29, 2021, Lores beneficially owned $249,383.56 of PayPal stock as of that date.

61.     Defendant Gail J. McGovern has served as a director of PayPal since June 2015.   She chairs the Governance Committee and is a member of the Compensation Committee.

62.     McGovern is President and CEO of the American Red Cross.

63.     Upon information and belief, McGovern is a citizen of Washington, DC.

64.     According to PayPal's 2021 Proxy Statement, McGovern beneficially owned 19,141 shares of the Company's stock as of the time of the aforementioned filing.  Based upon the closing price of the Company's common stock on March 30, 2021, McGovern beneficially owned $4,527,612.14 of PayPal stock on that date.

65.     For the fiscal year ended December 31, 2020, McGovern received $393,096 in compensation from the Company: $118,000 in fees earned $275,096 in stock awards.

66.     Defendant Deborah M. Messemer has served as a director of the Company since January 2019.  She is a member of the ARC Committee.

67.     Messemer is retired and is the former Major Market Managing Partner at KPMG.

68.     Upon information and belief, Messemer is a citizen of the State of California.

69.     According to the Company's 2021 Proxy Statement, Messemer beneficially owned 5,359 shares of the PayPal stock as of the time of the aforementioned filing.  Based upon the closing price of the Company's common stock on March 30, 2021, Messemer beneficially owned $1,267,617.86 of PayPal stock as of that date.

70.     For the fiscal year ended December 31, 2020, Messemer received $375,096 in compensation from PayPal: includes $100,000 in salary and $275,096 in stock awards.

71.     Defendant David M. Moffett has served as a director of the Company since June 2015.  He chairs the ARC Committee.

72.     Moffett is retired and is the former CEO, Federal Home Loan Mortgage Corp.

73.     Upon information and belief, Moffett is a citizen of the State of Florida.

74.     According to PayPal's 2021 Proxy Statement, Moffett beneficially owned 71,988 shares of the Company's stock as of the time of the aforementioned filing.  Based upon the closing price of the Company's common stock on March 30, 2021, Moffett beneficially owned $17,028,041.52 of PayPal stock as of that date.

75.     For the fiscal year ended December 31, 2020, Moffett received $395,096 in compensation from PayPal:  $120,000 in salary and $275,096 in stock awards.

76.     According to the Company's 2021 Proxy Statement, Moffett was Lead Independent Director of PayPal, from July 2015 through December 2018.

77.     Defendant Ann M. Sarnoff has served as a director of the Company since June 2017.  She is a member of the ARC Committee.

78.     Sarnoff is the Board Chair and CEO of WarnerMedia Studios and Networks Group.

79.     Upon information and belief, Sarnoff is a citizen of the State of California.

80.     According to the Company's 2021 Proxy Statement, Sarnoff beneficially owned 11,551 shares of the Company's stock as of the time of the

aforementioned filing.  Based upon the closing price of PayPal's common stock on March 30, 2021, Sarnoff beneficially owned $2,732,273.54 of PayPal stock as of that date.

81.    For the fiscal year ended December 31, 2020, Sarnoff received $375,096 in compensation from PayPal: $100,000 in salary and $275,096 in stock awards.

82.    Between February 3, 2021 and February 1, 2022, while the price of PayPal stock was artificially inflated and Sarnoff was in possession of material, adverse, nonpublic information, Sarnoff sold 5,290 shares of personally held PayPal stock, with a value of $1,605,461.10, at artificially inflated prices.

83.    Defendant Frank D. Yeary has served as a director of the Company since July 2015. He is a member of the ARC Committee.

84.    Yeary is the Managing Member of Darwin Capital Advisors, LLC.

85.    Upon information and belief, Yeary is a citizen of the State of California.

86.    According to the Company's 2021 Proxy Statement, Yeary beneficially owned 25,161 shares of the Company's stock as of the time of the aforementioned filing.  Based upon the closing price of the Company's common stock on March 30, 2021, Yeary beneficially owned $5,951,582.94 of PayPal stock on that date.

87.    For the fiscal year ended December 31, 2020, Yeary received $375,096 in compensation from PayPal: $100,000 in salary and $275,096 in stock awards.

88.    Defendants Schulman and Rainey are collectively the "Officer Defendants."    Defendants Adkins, Christodoro, Donahoe, Johnson, Lores, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary are collectively the "Director Defendants."

## IV.    DEFENDANTS' DUTIES

### A.    The Individual Defendants' Fiduciary Duties

89.    As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, finances, financial condition and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

90.    By reason of their positions as officers, directors and/or fiduciaries of PayPal, and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.

91.     Because of their positions of control and authority as officers and/or directors of PayPal, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with PayPal, each Individual Defendant had knowledge of material, nonpublic information regarding the Company.

92.     At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants and of PayPal and was at all relevant times acting within the course and scope of such agency.

93.     Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

94.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of PayPal.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

1. Exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's certificate of incorporation and bylaws);

2. Neither violate nor knowingly permit any officer, director, or employee of PayPal to violate any applicable laws, rules, or regulations;

3. Remain informed as to the status of PayPal's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

4. Establish and maintain systematic and accurate records and reports of the business and affairs of PayPal and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

5. Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of PayPal are conducted in accordance with all applicable laws, rules, and regulations; and

6. Truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.     PayPal's Code of Business Conduct and Ethics**

95.     The Individual Defendants, as officers and/or directors of PayPal, were bound by the Company's Code of Business Conduct and Ethics (the "Code").

96.     In pertinent part, the Code states that PayPal employees: "are expected to use good judgment and act in accordance with the Code, Company policies, and the law.  Our Code and Company policies provide the information you need to perform your job ethically, responsibly, and in compliance with the law.  This will

enable us to attract top talent, create best-in-class products, and uphold our commitment to serve as Customer Champions."[2]

97.    PayPal Employees are expected to:

- Review the Code and Company policies and understand the laws that apply to your work.

- Always be honest and fair in your business dealings internally and externally;

- Use good judgment, act in the best interests of PayPal, and seek guidance when you need it.

- Speak up and report suspected violations of the Code, Company policies, or the law;

- Encourage open communications free from the threat of retaliation; and

- Complete the annual Compliance training.

98.    When employees "face difficult decisions at PayPal," the Code requires that they "take the time to think and consider the legal and ethical issues. Don't give in to pressure and don't rush decisions. Listen carefully and consider the implications of your actions." Pursuant to the Code, PayPal employees are to evaluate their decisions as follows: "Is it honest and fair? Is it consistent with the Code and the law? Does it make you feel good about yourself and the Company?

---

[2] Code of Business Conduct and Ethics, PayPal Holdings, Inc.

Would you feel comfortable reading about your decision or action if it is reported in the media?"

99.    Through the Code, PayPal further outlines the responsibilities of people managers:

> [People managers] lead by example by demonstrating a commitment to acting with integrity every day and ensuring that employees feel comfortable asking for help and raising concerns….
>
> People managers are responsible for acting quickly if there is a suspected violation of the Code, a Company policy or the law. If an employee reports a suspected violation, people managers must:
>
> 1. Be responsive to employee concerns.
> 2. Take action when it is appropriate.
> 3. Seek help when needed.

100.    PayPal strives "to create an environment where everyone is encouraged to speak up and report concerns in good faith without fear of retaliation."

101.    People managers are expected to be role models and promote an ethical culture, demonstrating their commitment to the "highest ethical standards" in their work daily and expecting the same from the people who report to them.  They are responsible for fostering an environment where team members feel comfortable asking questions or raising concerns.  They are admonished not to "create or tolerate an environment where team members feel pressured to bend the rules."  Instead, people managers are to model these behaviors for their team, and "never give others

the impression that it is acceptable to ignore [PayPal's] Code, Company policies or the law."

102.  People managers are to listen to "listen and report problems."  They are to listen to team members and assure them that they are "doing the right thing when they speak up."  People managers are expected to promptly report any suspected violations of the Code, PayPal policies or applicable law that employees raise with them.  Further, if they are unsure of what to do, they are to "seek guidance [] role model[s] and promote an ethical culture."

103.  Employees are responsible for: "maintaining official business records in accordance with the Company's records management-related policies and retention schedules."  The aforementioned requires correct recording and reporting of financial data "without misleading, misrepresenting, misinforming, or omitting important information"; preserving "all documents relevant to accounting, litigation, government investigations, or internal/external audits until otherwise notified by Legal"; and disposing of business records that are no longer needed to be retained for business reasons.

104.  PayPal employees "have an obligation to our business, shareholders, employees, customers and regulators" to ensure that accounts and business records are complete, accurate, timely and understandable.  At PayPal, timely and accurate preparation of business records is critical, among other reasons, for internal decision

making reporting and serves as the foundation for reporting to regulators and shareholders.  Maintaining accurate records is "consistent" with PayPal's values and is critical to maintaining PayPal's reputation for integrity.

105.   The Code reminds PayPal employees that they must never falsify, forge, backdate or improperly alter any Company document.  They must ensure that all transactions are lawful, recorded in the proper account and executed in accordance with all Company internal controls.  Further, all disclosures they make to regulatory authorities and investors must be complete, accurate, timely and transparent.

106.   While the Code references employees, including managers, "[PayPal's] Code applies to every employee at every level of PayPal Holdings, Inc. and its subsidiaries … as well as our directors." According to PayPal, "we live by our code."

### C.   Corporate Governance

107.   As members of the Board, the Director Defendants were held to the highest standard of honesty and integrity and were charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

108.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PayPal, the absence of good faith on their part and a reckless disregard for their

duties to the Company and its stockholders that the Director Defendants were aware posed a risk of serious injury to the Company.

### D.   Additional Duties of the Audit Committee Defendants

109.   In addition to the duties discussed above with respect to all of the Individual Defendants, the Individual Defendants who served upon the Audit, Risk and Compliance Committee (the "ARC Committee Defendants") owed specific duties to PayPal under the Charter of the Audit, Risk and Compliance Committee ("ARC Charter").

110.   Among others, the ARC Charter set forth the following responsibilities of the ARC Committee Defendants:

4.  <u>Financial reporting principles and policies and internal controls and procedures</u>.

(a)   Consider and discuss with the independent auditors any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Committee by the independent auditors required by applicable accounting standards;

(b)   Confer with the independent auditors, the internal audit team and senior management in separate executive sessions to discuss any matters that the Committee, the independent auditors, the internal audit team or senior management believe should be discussed privately with the Committee;

(c)   Review with the Company's Chief Business Affairs and Legal Officer, Chief Risk Officer and/or Chief Compliance Officer, as applicable, any significant legal, compliance or regulatory matters that could have a material impact on the Company's financial statements,

business or compliance policies, including material notices to or inquiries received from governmental agencies;

(d)     Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

(e)     Discuss the types of financial information and earnings guidance (including the use of "pro forma," "adjusted" or other non-GAAP financial measures), and the types of presentations made, to analysts and rating agencies;

(f)     Discuss generally disclosure of key performance metrics, including how the measures are calculated or determined, whether they are consistently prepared and presented and how the Company's disclosure controls and procedures relate to disclosure of such measures;

(g)     Establish hiring policies for employees and former employees of the independent auditors. These policies shall provide that no former employee of the independent auditors may become the Chief Executive Officer, Chief Financial Officer, Vice President, Risk and Internal Audit, Chief Accounting Officer or Controller (or serve in a similar capacity) if such person participated in any capacity in the Company's audit within the one-year period preceding the date of the initiation of the audit;

(h)     Discuss with the independent auditors and management the internal audit department responsibilities, budget and staffing and any recommendations regarding the internal audit department;

(i)     Review the significant findings to management prepared by the internal audit department and management's responses;

(j)     Discuss earnings press releases;

(k)     Discuss the Company's treasury activities (including with respect to its capital structure, investments and cash management) and related risks; and

(l)     Discuss the Company's tax strategies and related risks.

5. <u>Reporting and recommendations</u>.

(a)     Prepare the report of the Committee and any other disclosures required by the rules of the SEC to be included in the Company's annual proxy statement and recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K;

(b)     Report to the Board on a regular basis and from time to time or whenever it shall be called upon to do so, and make recommendations to the Board as described in this charter and with respect to other matters as the Committee may deem necessary or appropriate;

(c)     Consider any reports submitted to the Committee by the independent auditors required by any applicable law or regulation;

(d)     Meet with management, the independent auditors and, if appropriate, the Chief Accounting Officer to discuss: the scope of the annual audit, the audited financial statements and quarterly financial statements including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal audit department or the independent auditors, relating to the Company's financial statements; any audit problems or difficulties, including any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management; any critical audit matters; any "management letter" or "internal control" letter issued, or proposed to be issued; any major issues regarding accounting principles and financial statement presentations, including any significant changes to the Company's auditing and accounting principles, policies, controls,

procedures and practices, and any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

(e) Inquire of the Company's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of the Company's internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

6. <u>Compliance Program</u>.

(a) Periodically review and approve the Company's enterprise-wide Compliance Program and Global Financial Crimes framework policies, as appropriate;

(b) Receive and discuss reports on the Company's Annual Risk and Compliance Plans;

(c) Review and discuss periodic reports from the Chief Risk Officer and Chief Compliance Officer, and other members of management as appropriate, regarding ongoing enhancements to, and overall effectiveness of, the Company's enterprise-wide Compliance Program and the Company's Global Financial Crimes Program;

(d) Review and discuss compliance risks, the level of compliance risk, management actions on significant compliance matters (e.g., actions taken to remediate significant compliance issues, progress of major compliance initiatives, and remediation progress of open regulatory actions) and reports concerning the Company's compliance with applicable law and regulation;

(e) Review and discuss significant examination reports from regulatory authorities, or summaries of the same;

(f) Review and discuss reports on any key organizational changes within the Company to ensure the Company's Compliance function has the appropriate size, skills, stature and independence;

(g) Review and discuss reports from management regarding significant reported ethics violations under the Company's Code of Business Conduct and Ethics and other corporate governance policies;

(h) Review and discuss reports on selected compliance topics as management or the Committee deems appropriate;

(i) Periodically review and approve the Company's Code of Business Conduct and Ethics; and

(j) Review and discuss all requests for waivers of the Code of Business Conduct and Ethics involving directors and executive officers and make recommendations to the Board as to whether it should approve any such request.

111.    While all ARC Committee Defendants must be "financially literate" in accordance with SEC and NASDAQ requirements, Defendant Messimer was designated by the company as meeting the requirements of a "Financial Expert" as defined by SEC regulations.  Thus, she had all of the following attributes: (i) an understanding of GAAP and financial statements; (ii) an ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves; (iii) experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting

issues that are generally comparable to the breadth and complexity of issues that can be reasonably be expected to be raised by the registrant's financial statements or experience actively supervising one or more persons engaged in such activities; (iv) an understanding of internal controls and procedures for financial reporting; and (v) an understanding of all ARC Committee functions.

112.   While Defendant Messimer was a "Financial Expert," each of the ARC Committee Defendants had extensive knowledge about financial matters due to their professional experience and/or service on public company boards.

### E.   Additional Duties of the Compensation Committee Defendants

113.   According to the Compensation Committee Charter, the purpose of the Compensation Committee of the Board is to review and approve all forms of compensation to be provided to the executive officers and directors of the Company, and the Individual Defendants who were members of the Compensation Committee during the Class Period (the "Compensation Committee Defendants") were responsible for the aforementioned.

114.   Pursuant to the Compensation Committee Charter, the Compensation Committee has the authority to undertake, among others, the specific duties and responsibilities listed below:

1.   At least annually, review, determine and approve the base salary, incentive compensation and long-term compensation for the

Company's Chief Executive Officer (the "CEO") and other executive officers of the Company.

2.    In consultation with senior management, establish, review, and evaluate the long-term strategy of employee compensation and the types of equity and other compensation plans used by the Company.

3.    Review and approve corporate goals and objectives relevant to the compensation of the CEO, evaluate the performance of the CEO in light of those goals and objectives, and determine and approve the CEO's compensation based on this evaluation. In determining the long-term incentive component of the CEO's compensation, the Committee shall consider, among other factors, the Company's performance and relative stockholder return, the value of similar incentive awards to CEOs at comparable companies, the awards given to the CEO in past years, and any other factors the Committee deems appropriate. In connection with this evaluation, the Committee may request and receive input from other non-employee Board members, and any Committee Advisor (defined below) either formally or informally.

4.    Approve any new compensation plan or any material change to an existing compensation plan, whether or not subject to stockholder approval, make recommendations to the Board with respect to the Company's incentive compensation plans and equity-based plans subject to stockholder approval, oversee the activities of the individuals and committees responsible for overseeing the Company's compensation plans, and discharge any responsibilities imposed on the Committee by any of these plans….

7.    Prepare and issue the evaluation required under "Annual Evaluation"….

9.    Review and approve the compensation of, and all compensation programs applicable to, members of the Board, including all cash compensation and all forms of equity compensation provided to members of the Board.

10.     Review the risks associated with the Company's compensation policies and practices, including an annual review of the Company's risk assessment of its compensation policies and practices for its employees.

11.     Oversee and monitor compliance with the stock ownership guidelines applicable to the executive officers of the Company and members of the Board.

12.     Oversee and monitor compliance with policies with respect to the recovery or "clawback" of compensation.

13.     Oversee the Company's compliance with SEC rules and regulations regarding stockholder approval of certain executive compensation matters, including advisory votes on executive compensation and the frequency of such votes, and the requirement under The Nasdaq Stock Market rules that, with limited exceptions, stockholders approve equity compensation plans.

14.     Review the results of any advisory stockholder votes on executive compensation and consider whether to recommend adjustments to the Company's executive compensation policies and practices as a result of such votes.

15.     After reviewing and discussing with management the Company's CD&A in connection with the Company's annual proxy statement and annual report on Form 10-K, prepare the Compensation Committee Report regarding the Committee's recommendation that the CD&A be included in the Company's proxy statement and annual report on Form 10-K in accordance with applicable SEC rules and regulations….

17.     Monitor the Company's compliance with the requirements under the Sarbanes-Oxley Act of 2002 relating to loans to directors and officers, and with all other applicable laws affecting employee compensation and benefits.

18.     Undertake any other responsibilities expressly delegated to the Committee by the Board from time to time relating to compensation matters.

**F.**     **Additional Duties of the Governance Committee Defendants**

115.    According to the Corporate Governance and Nominating Committee Charter (the "Governance Committee Charter"), the purpose of the Governance Committee of the Board is to: (i) determine the slate of director nominees for election to the Company's Board; (ii) recommend to the Board individuals to fill vacancies occurring between annual meetings of stockholders; (iii) recommend individuals for nomination as members of the standing committees of the Board; (iv) review the Company's corporate governance principles and recommend any changes to the Board; and (v) lead the Board in its annual evaluation of the Board and senior management.   The Individual Defendants who were members of the Governance Committee during the Class Period (the "Governance Committee Defendants") were responsible for the aforementioned.

116.   The Governance Committee Charter charged the Governance Committee Defendants with the following authority and responsibilities:

> 1.     To make recommendations to the Board from time to time as to changes that the Committee believes to be desirable to the size of the Board or any committee thereof.

> 2.     To identify individuals believed to be qualified to become Board members, and to determine the nominees to be recommended to the Board to stand for election as directors at the annual meeting of stockholders or, if applicable, at a special meeting of stockholders….

> 3.     To develop and recommend to the Board standards to be applied by the Board in making its determination as to the absence of

relationships between the Company and its subsidiaries and a director which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

4.      To review changes in a director's status that may impact independence or rise to the level of a significant conflict of interest, or affect the continued appropriateness of Board membership of directors who retire or change positions, as described in the Governance Guidelines.

5.      To identify Board members qualified to fill vacancies on any committee of the Board and to recommend that the Board appoint the identified member or members to the respective committee, taking into account any factors set forth in such committee's charter and any other factors the Committee deems appropriate, including determining whether to fill such vacancy.

6.      To exercise oversight of the annual evaluation process of the Board and its committees, recommend the evaluation process to the Board and lead the Board's annual evaluation….

8.      To review the Governance Guidelines at least annually and recommend any changes to the Board….

10.     To review and report to the Board on a periodic basis with regards to matters of corporate governance, including the review of, and recommendations with regards to, stockholder proposals and the annual stockholders' meeting. The Committee may, as appropriate in light of the proposal's subject matter, refer any proposal to any other committee of the Board for purposes of review and recommendations.

11.     To generally oversee the Company's management of topics related to environmental, social and governance (ESG) matters, including overall ESG strategy, risks and opportunities, stakeholder engagement and reporting, and programs and initiatives in social

innovation and environmental sustainability as well as the Company's annual Global Impact Report.

12.   To facilitate the Board's oversight of the Company's stockholder engagement practices and review and report stockholders' feedback to the Board….

14. To undertake any other responsibilities expressly delegated to the Committee by the Board from time to time relating to the nomination of Board and committee members or corporate governance or ESG issues.

## V.   DEFENDANTS' MISCONDUCT

### A.   Company Background

117.   PayPal was one of the first major online payment platforms.  Acquired by the internet shopping giant eBay in 2002, PayPal was spun off into an independent, publicly traded, company in 2015.  PayPal is a leading technology payment platform with a website and an app which enables digital payments between parties through online money transfers.

118.   PayPal's products enable its customers to transact with its merchants to purchase goods or services, whether the transaction is occurring online or in person, and to transfer money between PayPal accounts.

119.   PayPal has a deep understanding of the users of its platform.  In 2019, PayPal processed over 20 million transactions a day and collected reams of data about its customers' spending patterns, behavior, location and more.  This data

enabled PayPal to verify its customer's identities.  Within a two-second transaction, PayPal conducts hundreds, and sometimes thousands, of risk checks.

120.  PayPal has a variety of products, including its branded checkout product, a number of person-to-person payment products (Venmo, e.g.) which enable individuals to transfer money to other individuals.  PayPal also offers other services, such as "Buy Now Pay Later," which enables individuals to purchase items to be paid in instalments.

121.  PayPal earns revenue primarily through charging fees for completing payment transactions for its customers.  This revenue thus is dependent upon the overall volume of payment activity over PayPal's systems.  More payment volume generally yields more revenue for PayPal.

122.  Because PayPal principally generates revenue through fees on transactions, PayPal reports Total Payment Volume or "TPV," as a key indicator of performance.

123.  PayPal has two other key performance indicators: the total number of active accounts (NNAs being the net increase of the same); and the total number of payment transactions.

124.  NNAs are a critical indicator of PayPal's performance, as adding active accounts increases the size of PayPal's engaged user base and grows PayPal's ability

to earn revenue from transactions.   The more NNAs actively using PayPal's platform, the greater revenue PayPal is likely to generate.

**B.   PayPal's False/Misleading Statements About NNA Growth**

125.   In November 2020, PayPal set forth its plans for what it eventually called its "Super App." Through this app, PayPal would leverage its growing user base to offer a more integrated suite of financial offerings.   PayPal described the integration of a broad range of features, including check cashing, budgeting, bill pay, enhanced direct deposit, cryptocurrency support, and shopping tools, including buy now/pay later functionality.

126.   Defendant Schulman referred to the company's plans to overhaul its Venmo and PayPal apps as a "fundamental transformation" due to how much new functionality the apps would include.   The Super App would enable users to move easily from one experience to the next without having to change apps or use a desktop browser, for example.

127.   Maintaining strong NNA growth would be critical as PayPal for the Super App to be successful, as they were to be the expanding customer base to whom PayPal could sell the Super App's capabilities.   PayPal would need to achieve "massive scale" in order to realize PayPal's Super App ambitions.[3]

---

[3] Jenny Surane, *PayPal Wants to Be a Lot More than an Online Checkout Button*, May 10, 2021, https://www.bloomberg.com/news/articles/2021-05-10/paypal-wants-to-be-a-lot-more-than-an-online-checkout-button#xj4y7vzkg.

128.    Throughout the Class Period, PayPal emphasized its NNA growth to investors.

129.    On February 3, 2021, the beginning of the Class Period, the Defendants announced that the Company expected to add 50 million NNAs in 2021.

130.    During a conference call with investors the same day, Schulman noted that the percentage of customers that stopped doing business with and/or using PayPal or "churn rates" were decreasing  because of increased engagement.

131.    During PayPal's February 11, 2021 Investor Day conference, Schulman also touted PayPal's NNA growth and declining churn rate, stating:

> This is the first time we're going to talk about a metric, but I'm very excited that over the next five years, we believe we can grow this 377 million to 750 million active accounts on our platform.  And the reason we feel so confident about that is that we are seeing engagement levels increase dramatically throughout our base, especially with the new products that we've put out. Over the past five years, we've seen engagement levels grow by one and a half times, but given the success we've seen with the introduction of things like cryptocurrency, our offline or in-store strategies, our buy now, pay later capabilities, we are seeing historic engagement curves start to bend and accelerate.
>
> And that's especially important because those do two things.  One, they obviously increase the average revenue per user, and we expect that to grow substantially over the next five years.  And at the same time, it also reduces our churn rate. And as we get larger and larger, the more our churn rate reduces, the more our net new active cohorts can grow. And so that combination of scale and engagement is very exciting for us as we look forward.[4]

---

[4] Dan Schulman, CEO Remarks, PayPal Holdings, Inc. Investor Day 2021, Feb. 11, 2021.

132.   In early 2021, PayPal created a team, the "NNA Rally" team.  The NNA Rally team focused on meeting the ambitious NNA targets Schulman set.  Meetings of the team included discussions of the use of incentive programs to increase NNAs. These discussions included the fraud rates related to incentive programs, including the dangers of fraud attendant to referral programs and their likelihood of attracting the attention of overseas "click farms" which would create accounts simply to take advantage of offered incentives and artificially inflate the number of NNAs.

133.   NNA figures were closely tracked and measured.  PayPal's senior executives received detailed reports regarding NNAs that tracked new accounts, churn and account activity.  New accounts were analyzed in detail through daily, weekly and monthly reports.

134.   On May 5, 2021, PayPal raised its guidance for 2021 NNAs to between 52-55 million from previous expectations of 50 million.  According to PayPal, it was on track to end 2021 with approximately 430 million active accounts.

135.   On July 28, 2021, PayPal reported second quarter 2021 results and stated that it was reaffirming its guidance of gaining 52 to 55 million NNAs in 2021, suggesting the Company expected to be "at the higher end" of that range.

136.   During a conference call with investors on July 28, 2021, Rainey was asked the following:

> Hey, good afternoon, guys. Maybe, John, just want to talk a little bit about the net new actives? I think we've beaten the take rate to death here.  But

41

obviously, you're implying pretty meaningful acceleration in the back half of the year.  Then as you go out longer term, even a further acceleration on an annual basis to get to that 750 million.  Just curious, what's driving the confidence in this year, and then longer term?  Are you assuming any that 750 million are acquired inorganically?  Or is that a purely an organic number?

Defendant Rainey replied, in pertinent part:

Longer term, generally speaking, that's going to be organic.  Maybe we'll pick up a little bit here and there, from smaller acquisitions, but it doesn't contemplate any large acquisition to get to that number.  I think to understand what's happening with net new actives, it's really helpful to zoom out on the second quarter and think about the 11.4 million net new actives that we added this quarter. Appreciate that the most significant pressure from churn happened that quarter, right, because we added over 7 million net new actives in the quarter of the prior year. We've got huge pressure on churn there and even with that, we had 11.4 million net new actives, which by historical standards would have been fantastic, right? This is the low point of net new actives for the year. When we look at the level of activations and reactivations for the back half of the year, combined with the improved churn levels that we've seen pre COVID, that gives us a lot of conviction around being able to get to the numbers that we've targeted. We've also, I think, really improved our capabilities around customer acquisition than where we were a couple years ago. Much better clarity with what cost of acquisition is, what the customer lifetime value is, and the ability to spend marketing dollars into that. But fundamental to your question around how do we think that we'll achieve those 750 million [active accounts] really comes down to user engagement. As we add more experiences to the wallet, more ways for people to use us, different channels, being able to use us offline, we think that that is going to drive a lot of that increase in net new actives, and accordingly, user engagement.[5]

137.   Rainey made no mention of the cash incentives for new account users.

138.   On November 8, 2021, PayPal reported third quarter 2021 results and stated it remained on track to deliver more than 52 million NNAs in 2021, dropping

---

[5] PayPal Holdings, Inc., Q2 2021 Analyst Call, Jul. 28, 2021.

the language about being towards the high end of 52-55 million NNAs.  Less than

expected revenues were blamed on back-to-school sales and travel.

139.   During a conference call with investors the same day, Schulman was

asked with regard to NNAs:

> I just want to touch on the organic trends of the business, mainly the KPI, net
> new actives. And just maybe if you can give a little more color on the organic
> dynamics you're seeing now a year and a half into COVID in terms of gross
> adds versus the churn levels.  We're also getting more questions on '22
> guidance and some of the inputs there.

140.   In response, Shulman maintained that the 750 million NNAs by 2025

remained PayPal's target and emphasized that a "reduction in churn becomes a really

important element of our ability to get to the 750 million."  Schulman further

maintained NNAs would in fact accelerate going forward because of the "halo

effects" inside the business, such as introducing "buy now, pay later" and keeping

users engaged with other offerings.

141.   During the buy side call the following day, PayPal was again asked

about the NNA figures.  "So, I guess maybe we can talk about net new adds…. So,

it seems like the Q4 NNAs are coming in a little bit lower than you might have

otherwise expected. Can you just talk about the drivers of that dynamic?"   In

response, Rainey stated:

> Our net new actives are going to do better than what we originally expected
> on an organic basis…. [Low quality new actives] is not something that we
> want to chase as a company, and we can certainly go out and spend money on
> customer acquisition and get very low value net new actives to inflate or pump

up that number, but that's not the right economic decision for us longer term. And I've got confidence in where we are longer term around net new actives.[6]

142.   Each of the above statements were materially false and/or misleading and failed to disclose material adverse factors about the Company's business and operations.  Specifically, the Individual Defendants intentionally or recklessly made or permitted false and misleading statements and failed to disclose that Defendants inflated NNAs and NNA metric guidance through marketing campaigns that were easily manipulable and susceptible to fraud, which fraud Defendants were aware, and used these marketing campaigns and other incentives to hide the Company's true churn rate and declining levels of user engagement with the platform.

143.   The Individual Defendants also failed to maintain sufficient internal controls concerning NNA related risks and the adequacy of its public disclosures.

## C.   The Truth Is Revealed

144.   On February 1, 2022, PayPal reported that its 2021 NNAs were only 49 million, less than the guidance of 50 million it provided in February 2021 and lower than projections it made—and reconfirmed as accurate guidance—just months prior.

145.   PayPal further admitted that, in 2021, the Company pursued a risky strategy to retain those customers most likely to churn.  The Company stated that it "leaned into incentivized customer acquisition tactics to a much greater extent than

---

[6] PayPal Holdings, Inc., Q3 2021 Buyside Call, Nov. 9, 2021.

we ever have in our history."  PayPal noted that while "these programs are very successful in generating account creation, these customers have lower engagement and a higher propensity to churn and have not met our required level of return.  This dynamic compounds over time as it requires increasing investment simply to keep minimally-engaged users on our platform."

146.   The PayPal further disclosed that "in connection with the increased use of incentive campaigns throughout 2021, [PayPal] identified 4.5 million accounts that [it] believe[d] were illegitimately created," in order to take advantage of cash account opening incentives and that as a result.  the Company changed course on some of its customer acquisition strategies, including incentive-led campaigns, in the fourth quarter.

147.   PayPal also admitted that the number of fraudulent accounts "affected [its] ability to achieve its guidance in the quarter."  PayPal described the fraudulent accounts issue as the "most impactful to the [fourth] quarter" and maintained that it regularly assesses its active account base to ensure the accounts are legitimate.  The Company further noted that checking for fraudulent activity is particularly important during incentive campaigns that can be targets for bad actors attempting to reap the benefit from these offers without ever having any intent to be a legitimate customers on its platform.

148.    While attempting to minimize the illegitimate account problem, as well as the problem with churn caused by the cash incentive program, Rainey disclosed that PayPal was "evolving" its customer acquisition and engagement strategy and expected only 15-20 million net new customer accounts for 2022.   Moreover, according to Rainey, the Company "no longer believe[d] that the 750 million medium-term account aspiration [it] set last year, is appropriate."

149.    On this news, PayPal's stock price fell $43.23, or almost 25% in one-day, to close at $132.57 per share on February 2, 2022.

150.    Moreover, in April 2022, a mere month later, PayPal again lowered guidance, estimating only 10 million NNAs for the year.  By the end of April 2022, PayPal shares were trading at only $87.93, over seventy percent lower than the $308.53 share price reached in July 2021, when the NNA projections were over four times as high at 52-55 million.

**D.    Insider Trading**

151.    While many of PayPal's stockholders lost considerable sums with the shares' decline upon disclosure of the truth of the NNAs and problem projections, certain of the PayPal insiders were able to sell their shares at artificially high prices and avoid the staggering losses suffered by the Company's other stockholders. During 2021, as PayPal was touting its growth and positive financial forecast, certain corporate insiders elected to sell certain of their shares of PayPal stock.   These

Defendants, Defendants Schulman, Rainey and Sarnoff, are collectively referred to herein as the "Insider Seller Defendants."

152. For example, the following chart reflects insider transactions during the Class Period as found in Insider Seller Defendants' Form 4 filings with the SEC:

| Name | Number of Shares Sold | Total Value of Shares Sold |
|---|---|---|
| Schulman | 347,235 | $91,187,135.96 |
| Rainey | 146,291 | $39,111,582,31 |
| Sarnoff | 5,290 | $1,605,462.10 |

All of the Insider Defendants' insider transactions during the Class Period are set forth more fully in Exhibit A.

153. As a result of the false and misleading disclosures and failures to disclose as set forth above, these insider stock sales conducted by the Insider Selling Defendants occurred at artificially inflated share prices, which the Insider Selling Defendants knew was the case when they were making those sales.

**E.    PayPal Stock Repurchases**

154. While Defendants knew that the NNA figures included fraudulent and inactive accounts that artificially boosted the NNA figures and targets and that the public was unaware of the same—and while the Insider Selling Defendants were

selling their shares of the Company's stock at artificially inflated prices—the Individual Defendants caused the Company to repurchase PayPal stock at artificially inflated prices during the Class Period, the Defendants caused PayPal to repurchase millions of shares of the Company's stock.  In total, PayPal repurchased 17,400,000 shares of stock for $3,625,360,000.00 during the Class Period

155.   All of the stock repurchases made during the Class Period are set forth more fully in Exhibit B.

## VI.   DAMAGES TO PAYPAL

156.   As a direct and proximate result of the Individual Defendants' misconduct, PayPal has suffered and continues to suffer significant harm, including, but not limited to:

a.   Legal and other costs incurred in connection with, and the distraction of, investigating and defending securities fraud class actions and insider trading investigations, as well as potentially billions of dollars in damages in connection with any settlement of or judgment in these lawsuits;

b.   Legal, accounting, regulatory and other costs incurred due to an increase in scrutiny of PayPal's statements concerning its projections and business outlook;

c.   The irreparable harm to the Company's reputation, loss of

credibility, and loss of goodwill associated with the Company's failure to disclose problems that it knew or should have known it had with NNA growth and engagement—including rampant fraud—business growth, financial outlook and the specter of insider trading;

       d.    Costs incurred in connection with the Company's repurchases of its common stock at artificially inflated prices as a result of the material misstatements and omissions detailed herein; and

       e.    Costs incurred from compensation and benefits paid to the Individual Defendants and other members of PayPal's management while they were engaged in the improper conduct alleged herein.

## VII.  CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

157.  In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

158.  During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things, deceive the investing public including stockholders of PayPal.  In furtherance

49

of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

159.   Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused and/or allowed the improper conduct described herein.

160.   The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

161.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein.   Because Defendants' actions occurred under the authority of the Board, each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

162.   Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment

of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   DERIVATIVE ACTIONS

163.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by PayPal as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

164.   PayPal is named as the nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

165.   Plaintiff Nelson will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

166.   Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

## IX.    DEMAND REFUSED ALLEGATIONS

167.   On November 9, 2022, Plaintiff made formal demand on the Board to investigate and commence legal proceedings against the Individual Defendants for

breaches of fiduciary duties and violations of federal securities laws.  *See* Exhibit C, attached hereto.

168.   On March 15, 2023, Tracy Donahue, Senior Director and Associate General Counsel for PayPal, sent a letter to Plaintiff's counsel stating that the Board would defer action on the Demand until resolution of the Consolidated Securities Class Action.  *See* Exhibit D, attached hereto.

169.   Plaintiff's Demand was wrongfully refused, as the Board responded to the demand with a two-page conclusory refusal letter without conducting any investigation or interviews or even engaging in document review and produced no report of its conclusions or findings.

170.   The failure to promptly conduct an investigation was made in bad faith. Further, the decision to defer investigating the wrongdoing was made by the Insider Trading Defendants who committed wrongdoing by selling shares at inflated prices, while they had adverse non-public information, during the Class Period.  Moreover, the decision was made by the Director Defendants who engaged in corporate waste by, among other things, causing PayPal to repurchase billions of dollars of stock at artificially inflated prices.  In addition, the Individual Defendants all are implicated in the scheme to include known illegitimate and inactive accounts in NNAs which resulted in further corporate waste, inflated the company's NNA projections and hid the Company's negative business prospects resulting from the problem accounts.

Thus, the Individual Defendants are not independent and have an interest in avoiding an investigation and the resulting consequences to themselves, including financial consequences, thereof.

## FIRST CAUSE OF ACTION
### Violations of Section 14(a) of the Exchange Act
### (Against the Reelected Director Defendants)

171.   Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

172.   The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

173.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

174.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

175.   The 2021 Proxy Statement was materially false and misleading because the Individual Defendants failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing PayPal's core operations and making truthful, accurate and complete statements to investors and customers, which resulted in the Company being named a defendant in the Consolidated Securities Class Action, among other lawsuits; (2) effectively oversee the material risks facing the Company, leading to millions accounts which were fraudulent or subject to churn, and negative financial results and grossly inflated NNA figures and projections; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's weakening growth and inability to meet its financial guidance.

176.   The misleading information contained in the 2021 Proxy Statement was material to PayPal's stockholders in determining whether to re-elect Defendants Adkins, Christodoro, Donahoe, Johnson, McGovern, Messemer, Moffett, Sarnoff and Yeary (collectively, the "Reelected Director Defendants") to the Board.

177.   The material misstatements and omissions in the 2021 Proxy Statement damaged the Company.

178.   Plaintiff, on behalf of PayPal, seek relief for damages inflicted upon the Company based on the misleading 2021 Proxy Statement in connection with the improper election of the Reelected Director Defendants to the Board.

## SECOND CAUSE OF ACTION
**Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

179.   Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

180.   The Officer Defendants owed and owe fiduciary duties to PayPal.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe PayPal the highest obligation of good faith and loyalty in the administration of PayPal's affairs, including assuring that PayPal complied with state and federal laws governing, among other things, the making of truthful, complete and accurate public statements regarding the Company's financial condition and business prospects.

The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to PayPal alleged herein.

181.   The Officer Defendants ignored their obligations under state and federal law.  The Officer Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

182.   The Officer Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of PayPal in a manner consistent with the duties imposed upon them by law.

183.   By committing the misconduct alleged herein, the Officer Defendants breached their duties of good faith and loyalty in the management and administration of PayPal's affairs and in the use and preservation of PayPal's assets.

184.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, PayPal has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending securities class action lawsuits.

185.   As a result of the misconduct alleged herein, the Defendants are liable to the Company.

186.   The Officer Defendants, Shulman and Rainey, also owed and owe fiduciary duties to PayPal and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.   In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

187.   The Officer Defendants violated these duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

188.   The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways: affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and financial outlook.

189.   As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, PayPal has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

190.  Plaintiff, on behalf of PayPal, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duties**
**(Against the Director Defendants)**

191.  Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

192.  The Director Defendants owed and owe PayPal fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe PayPal the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal privacy laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

193.  The Director Defendants also owed and owe PayPal fiduciary duties under state corporation law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.

194.  In addition, the Director Defendants have specific fiduciary duties as defined by the Code, Company's corporate governance documents, and the charters of various Board committees, and principles that, had they been discharged in

accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

195.   Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

196.   The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a.   Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

b.   Affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and financial outlook;

c.   Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including, but not limited to, requirements imposed under privacy laws as well as state and federal securities laws;

d.   Awarding PayPal's senior executives' lavish compensation packages, and paying the Officer Defendants substantial sums, despite their responsibility for the Company's willful misconduct;

59

e.　　Causing PayPal to repurchase $3,625,360,000.00 billion of stock at prices artificially inflated by Defendants' conduct;

f.　　Reappointing the same directors who failed in their duties to the Corporate Governance Committee;

g.　　Reappointing the same directors who failed in their duties to the Compensation Committee; and

h.　　Reappointing the same directors who had failed in their duties to the ARC Committee.

197.　As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, PayPal has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

198.　Plaintiff, on behalf of PayPal, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duties for Insider Selling and**
**Misappropriation of Company Information**
**(Against the Insider Selling Defendants)**

199.　Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above  as though fully set forth herein.

200.　At the time the Insider Selling Defendants sold their PayPal stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

201.   The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, revenue growth, and the sufficiency of the Company's internal controls—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its stockholders on equal terms.   Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

202.   At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition, its future business prospects, and the NNA figure related issues hindering Company growth.

203.   The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

204.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

205.   As a direct and proximate result of the Insider Selling Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

206.   Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (Against the Insider Selling Defendants)

207.   Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above  as though fully set forth herein.

208.   At the time the Insider Selling Defendants sold their PayPal stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

209.   At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition and its adverse future business prospects that hindered Company growth and thus knew that the shares of PayPal stock were being traded at inflated prices while the public remained unaware of the same.

210.   Insider Selling Defendants, by selling their shares of stock at share prices that they knew were inflated based upon their insider knowledge of the Company's proprietary information (the "Inflated Price Shares"), received unfair benefits and a windfall.

211.   It would be inequitable for the Insider Selling Defendants, who used the Company's proprietary information for their own financial gain, to retain the benefit that they received through the sale of the Inflated Price Shares.

212.   The Insider Selling Defendants have been unjustly enriched, and Plaintiff, as a stockholder and representative of PayPal, is entitled to restitution in the amount of the benefits unjustly conferred upon the Insider Selling Defendants.

**SIXTH CAUSE OF ACTION**
**Waste of Corporate Assets**
**(Against the Individual Defendants)**

213.   Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

214.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Consolidated Securities Class Action and other  ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

215.   Further, as a result of the failure to allow the Company to implement adequate internal and financial controls, the Individual Defendants have caused PayPal to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

216.   In addition, the Individual Defendants have wasted corporate assets by causing PayPal to repurchase $3,625,360,000.00 of stock at prices artificially

inflated by their misconduct.  As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

217.   Plaintiff, on behalf of PayPal, has no adequate remedy at law.

**SEVENTH CAUSE OF ACTION**
**Gross Mismanagement**
**(Against the Individual Defendants)**

218.   Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

219.   The Individual Defendants had a duty to the Company and its stockholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

220.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

221.   During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching

their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

## EIGHTH CAUSE OF ACTION
**Aiding and Abetting**
**(Against the Individual Defendants)**

222.  Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

223.  Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

224.   In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

225.   Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct,

necessary and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

226.   Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**NINTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against the Individual Defendants)**

227.   Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

228.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of PayPal.  Defendants were unjustly enriched because of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

229.   Plaintiff, as a stockholder and representative of PayPal, seeks restitution from Defendants, collectively and individually, and seeks an order of this Court disgorging all profits, benefits, severance payments, and other compensation obtained by the Individual Defendants, collectively and individually, in connection with, from or at the time of their wrongful conduct and fiduciary breaches.

230.   Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Finding that this action is a proper derivative action maintainable under law;

B.     Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, and were unjustly enriched;

C.     Against each Defendant in favor of PayPal for the amount of damages sustained by PayPal, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.     Requiring Defendants to return to PayPal all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

E.     Declaring the Plaintiff may maintain this action on behalf of PayPal and that Plaintiff Nelson is an adequate representative of the Company;

F.     Declaring that the Reelected Director Defendants violated Section 14(e) of the Exchange Act;

G.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PayPal;

H.     Declaring that the Insider Selling Defendants have breached their fiduciary duties and misappropriated company information;

I.     Declaring that the Insider Selling Defendants have been unjustly enriched;

J.     Declaring that the Individual Defendants have wasted PayPal's corporate assets;

K.     Declaring that the Individual Defendants have grossly mismanaged PayPal;

L.     Declaring that the Individual Defendants have been unjustly enriched;

M.     Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight;

N.     Determining and awarding to PayPal the damages sustained as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgement and post-judgement interest thereon;

O.     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

P.     Awarding PayPal restitution from the Individual Defendants, and each of them;

68

Q.     Directing PayPal to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PayPal and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     A proposal to strengthen the Company's controls over accounting and financial reporting;

2.     A proposal to strengthen the Board's supervision of operations (including research & development along with third-party contracts) and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.     A proposal to strengthen PayPal's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

4.     A provision to control insider selling and conflicts of interest;

5.     A provision to permit the stockholders of PayPal to nominate at least three candidates for election to the Board;

6.   A proposal to enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

7.   A proposal to ensure that the Chief Compliance, Risk and Legal Officer(s) and other company leadership have (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

8.   A proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, auditing and monitoring processes and procedures;

9.   A proposal to review and implement the confidential reporting structure and investigative process of complaints within the company;

R.   Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that PayPal's directors, officers, and employees do not engage in wrongful or illegal practices;

S.   Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

T.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

U.    Granting such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated April 4, 2023                    Respectfully submitted,

By: s/ *Serina M. Vash*____
   Serina M. Vash
(N.J. Bar No. 041142009)
HERMAN JONES LLP
153 Central Avenue, # 131
Westfield, New Jersey 07090
Telephone: 862-250-3930
svash@hermanjones.com


HERMAN JONES LLP
John C. Herman (Ga. Bar No. 348370)
(to seek admission pro hac vice)
Candace Smith (Ga. Bar No. 654910)
(to seek admission pro hac vice)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
csmith@hermanjones.com

*Counsel for Plaintiff Stephen Nelson*